**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| H & R FARMS II | Case No. 6:23-cv-00249 |
| *Plaintiff,* | |
| v. | CLASS ACTION |
| SYNGENTA CORPORATION, SYNGENTA CROP PROTECTION, LLC, SYNGENTA CROP PROTECTION AG, CORTEVA, INC., BASF SE, BASF CORP., and BASF AGRICULTURAL PRODUCTS GROUP | JURY DEMANDED |
| *Defendants.* | |

## CLASS ACTION COMPLAINT

Plaintiff H & R Farms II ("Plaintiff"), by its undersigned counsel, on its own behalf and on behalf of all others similarly situated (the "Class," as defined below), brings this action against Defendants Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC (collectively, "Syngenta"); BASF SE, BASF Corporation, and BASF Agricultural Products Group (collectively, "BASF"); and Corteva, Inc. ("Corteva"; collectively with Syngenta and BASF, the "Defendants") and alleges as follows:

### I.  NATURE OF THE ACTION

1.      Farmers have been grappling with skyrocketing operating expenses for the last several years. In a 2018 survey, 80% of farmers reported their costs were increasing and they were unable to pay their debts—estimated to exceed $400 billion in 2019.

2.      A large portion of a farmer's operating expense is related to the purchase of crop protection products, which include agricultural pesticides. There are three main categories of pesticides: herbicides, insecticides, and fungicides. These products are used by farmers and growers to target unwanted plants or weeds, insects, and fungal diseases, respectively.

3.      Defendants, through the use of "loyalty" or "rebate" programs with cooperating distributors, unfairly impede competitors and artificially inflate the prices that farmers pay for pesticides. These programs substantially hindered access by farmers to lower-cost generic alternatives.

4.      Similar to the regulatory framework governing the pharmaceutical industry, the pesticide industry is subject to patent and safety regulations that confer certain exclusivity benefits on developers of new active ingredients that are approved by the United States Environmental Protection Agency ("EPA"). Under Congress's patent and regulatory scheme, Defendants are "basic" manufacturers that initially develop, patent, and register the active ingredients that make pesticides effective. Once approved, these basic manufacturers possess certain exclusive rights for a period of years. Once the exclusivity period expires, generic manufacturers may enter the market with equivalent products that contain the same active ingredients and rely on the same toxicology and environmental impact data first developed by those basic manufacturers. Competition from generic products leads to significant price reductions.

5.      On September 29, 2022, following an investigation, the FTC filed a complaint against Defendants alleging that Defendants' loyalty programs foreclose generic competition and result in higher prices for farmers in violation of federal antitrust law.[1]

6.      As revealed by the FTC's investigation, Defendants' loyalty programs provide that Defendants will make payments to participating distributors in the form of "rebates," based on their purchases of Defendant-branded pesticides, but under one condition: distributors must limit their purchases of generic pesticides to a set percentage. Indeed, Defendants ensure that distributors profit more from accepting Defendants' "rebate" payments than they would from distributing a higher volume of lower-priced, generic pesticides.

---

[1] Complaint, *FTC et al. v. Syngenta Crop Protection AG et al.*, 1:22-cv-00828 (M.D.N.C. Sept. 29, 2022), ECF No. 1.

7.     Distributors dominate the sale of crop protection products in the United States. Thus, the scheme among the respective Defendants has substantially foreclosed generic competitors from efficient distribution of their products. Even when distributors offer competing generics, their agreements with Defendants restrict the sale of these generics to minimal volumes, forcing the generic manufacturers to market their products through less efficient channels of distribution. While Defendants benefit, farmers are left to pay supra-competitive prices for pesticides and are deprived of access to cheaper generic alternatives.

8.     As a result of Defendants' and the distributors' conduct, Defendants have restrained competition, maintained unlawful monopolies, and harmed America's farmers, reducing choices for these farmers and costing them millions of dollars in overcharges.

9.     Plaintiff seeks to recover damages in the form of overcharges that it and the Class defined herein incurred due to Defendants' violations of the antitrust laws in the markets for certain pesticides. Defendants engaged in conspiracies with distributors to illegally extend and maintain their respective monopolies with respect to certain crop protection products by entering into loyalty programs to delay generic competition, in violation of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) and Section 3 of the Clayton Act (15 U.S.C. § 14). For these claims, Plaintiff and Class members herein seek treble damages and injunctive relief under 15 U.S.C. §§ 15 and 26, and other just relief.

## II.     PARTIES

### A.     Plaintiff

10.     Plaintiff H & R Farms II is an farm partnership headquartered at 30026 Burnell Road, Gueydan, LA 70542.

### B.     Defendants

11.     Defendant Syngenta Corporation is a corporation organized and operating under the laws of the State of Delaware with a principal place of business at 3411 Silverside Road, #100, Wilmington, Delaware 19810. Syngenta Corporation may be served through its registered agent, The Corporation Trust Company, at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801. Syngenta Corporation transacts or has transacted business in this Judicial District either directly or through its agents.

12.     Defendant Syngenta Crop Protection, LLC, is a limited liability company organized and operating under the laws of the State of Delaware, with its principal place of business at 410 South Swing Road, Greensboro, North Carolina 27409. Syngenta Crop Protection, LLC may be served through its registered agent, C T Corporation System, at 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604. Syngenta Crop Protection, LLC transacts or has transacted business in this Judicial District either directly or through its agents.

13.     Defendant Syngenta Crop Protection AG is headquartered in Basel, Switzerland and is organized and existing under the laws of Switzerland. Since in or about May 2021, Syngenta Crop Protection AG has been an indirect subsidiary of Sinochem Holdings Corporation Ltd., a chemical company based in Beijing, China. Syngenta Crop Protection AG's North American headquarters is located within in its 70-acre campus in Greensboro, North Carolina. Syngenta Crop Protection AG transacts or has transacted business in this Judicial District either directly or through its agents.

14.     Corteva, Inc. is a publicly held corporation headquartered at 9330 Zionsville Road, Indianapolis, Indiana 46268. Corteva is the successor company to the agriscience businesses of E.I. du Pont de Nemours ("DuPont") and Dow Chemical Company ("Dow"). Corteva is a corporation organized and existing under the laws of the State of Delaware. Substantially all of Corteva's revenue is derived from sales of seeds and crop protection products to farmers, distributors, and

manufacturers. Indeed, Corteva sold $4.382 billion in crop protection products in just the first half of 2022. Corteva transacts or has transacted business in this Judicial District either directly or through its agents.

15.     Defendant BASF SE is a multinational global chemical company headquartered in Ludwigshafen, Germany. It is the largest chemical producer in the world. BASF SE transacts or has transacted business in this Judicial District either directly or through its agents.

16.     Defendant BASF Corp. is headquartered at 100 Park Avenue, Florham Park, New Jersey 07932 and is the North American affiliate of BASF SE. BASF Corp. transacts or has transacted business in this Judicial District either directly or through its agents.

17.     BASF Agricultural Products Group is a division of BASF SE and is headquartered at 14385 West Port Arthur Road, Beaumont, Texas 77705. BASF Agricultural Products Group transacts or has transacted business in this Judicial District either directly or through its agents.

### III.     JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. § 26.

19.     Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) and (c) because Defendants transacted business throughout the United States, including in this Judicial District, during the Class Period.

20.     This Court also has personal jurisdiction over Defendants because during the Class Period, Defendants sold and shipped certain crop protection products in a continuous and uninterrupted flow of interstate commerce, which included sales of certain crop protection products in the United States, including in this Judicial District. Defendants' conduct had direct, substantial, and reasonably foreseeable effects on interstate commerce in the United States, including in this Judicial District.

# IV.    FACTUAL ALLEGATIONS

## A.    The Pesticide Industry

21.    Most pesticides sold in the United States are sold to farmers and growers for use as crop protection. Pesticides protect crops by killing or controlling pests—*i.e.*, diseases, weed, insects, and other organisms—and thus are known as "crop protection products." As used herein, and consistent with industry practice, the term "pesticides" refers collectively to insecticides (including nemanticides), herbicides, and fungicides.

22.    All pesticides contain at least one "active ingredient" or "AI." The active ingredient is the chemical substance that kills or controls the targeted plant, animal, or fungal pest. Active ingredients may be sold in two forms: (1) as standalone active ingredients, which can be mixed with inactive ingredients such as water, adjuvants, surfactants, or in some cases other active ingredients, prior to application; or (2) as part of pre-mixed pesticide formulations that are ready to be applied to crops.

23.    Several criteria serve to distinguish one active ingredient from another, including the pest(s) they target, their effectiveness, the crops for which they are suited, the stage of the growing cycle at which they can be used, and their performance under prevailing climate and weather conditions. Moreover, each active ingredient has what is referred to as a "mode of action," which is the chemical and biological sequence of events that causes a pesticide to kill or control the targeted pest.  While active ingredients that share a common mode of action tend to have similar uses, there are often differences in performance and other reasons why one active ingredient cannot readily replace another for a given application or a given condition, and why farmers may prefer one active ingredient over another. As a result, a chemically equivalent generic pesticide is a closer substitute for a given branded product than is a product containing a different active ingredient. Accordingly, active ingredients do not readily replace each other in a given application or condition.

24.    Defendants formulate, market, and sell agricultural pesticides. They themselves

may synthesize the active ingredients for their own fully formulated pesticide products, or they may purchase the active ingredients in their pesticide formulations from other manufacturers.

25.     "Basic" manufacturers are those that research, develop, and patent new active ingredients. Defendants are basic manufacturers and among the largest manufacturers of pesticides in the United States and globally.

26.     Generic manufacturers primarily sell pesticides containing active ingredients initially developed by basic manufacturers. To do so, they must wait for regulatory and patent exclusivity periods on the active ingredients to expire. More than a dozen generic manufacturers sell pesticides in the United States.

27.     In general, pesticide manufacturers sell to distributors that sell to, and in many cases are integrated with, retail outlets across the United States. This is referred to as the "traditional distribution channel."

28.     Selling through distributors is the most efficient way for a pesticide manufacturer to reach farmers for a variety of reasons. Distributors offer services such as warehousing, transportation, credit and marketing, among others. They provide access to a network of customers, including farmer and retail customers dispersed throughout the country. And they provide scale and services that would require substantial investments if a manufacturer attempted to replicate the same services on its own. Even then, manufacturers lack the pre-existing relationships that retailers maintain with farmers in their local region. Accordingly, a manufacturer cannot effectively compete without access to the traditional distribution channel

29.     By selling to a relatively small number of distributors, the manufacturer can reach thousands of retailers, who can in turn reach hundreds of thousands of farmers with greater efficiency.

30.     In fact, upon information and belief, sales through this traditional distribution channel account for approximately 90% or more of all sales of pesticides in the United States. Just seven

distributors—including Winfield Solutions, LLC, Univar Solutions, Inc., Nutrien AG Solutions, and Helena Agri-Enterprises—account for more than 90% of sales through the traditional channel, and therefore account for approximately 80% or more of all sales of pesticides to farmers in the United States.

### B.  Regulatory Framework

31.     Congress's patent and regulatory framework governing pesticides seeks to encourage innovation for the developers of new active ingredients, while simultaneously facilitating generic entry into the market and price competition after patents expire and exclusivity periods end.

32.     A basic manufacturer of a new active ingredient can apply for U.S. patent protection for a term beginning when the patent issues and expiring twenty years after the initial patent application.

33.     The basic manufacturer may also obtain certain exclusive rights under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"). FIFRA requires submission, review, and approval by the United States Environmental Protection Agency ("EPA") of detailed toxicology and environmental impact data prior to the sale or distribution of any pesticide in the United States to ensure the product's safety.

34.     Once the EPA approves a new active ingredient, the original manufacturer receives the exclusive right to cite the data it submitted in support of its active ingredient registration for ten years. Often, this ten-year exclusivity period extends beyond the basic manufacturer's patent protection, bestowing twenty-plus years of exclusivity on the basic manufacturer.

35.     After the basic manufacturer's exclusivity expires, a generic manufacturer of pesticides with a pesticide product containing the same active ingredient may enter the market. These products may be equivalent to the basic manufacturer's product ("branded product") or may combine the active ingredient with other ingredients to make new products. A generic entrant must apply to

register its product for sale in the United States under FIFRA. However, FIFRA permits generic entrants to rely on the basic manufacturer's data. In turn, the basic manufacturer may be entitled to compensation payments for its data, depending on the generic entrant's reliance on the data.

36.     Generic pesticides and active ingredients are usually sold at lower prices than the equivalent branded products sold by Defendants. As the generic manufacturers enter the market and gain market share, price competition ensues, causing the branded products' price and sales volume to decline.

37.     When the brand manufacturers expect generic entry on an active ingredient, Defendants employ certain strategies intended to block generic entry at the end of patent exclusivity and minimize the impact on prices and market shares of their branded products. Incentivizing distributors to circumvent generic entry, through so-called "loyalty programs," is instrumental to Defendants' strategies.

## C.     Defendants' Loyalty Programs

38.     Defendants have each benefited from long-lasting exclusivity rights under Congress's framework. But, unwilling to relinquish the pricing and market-share benefits of exclusivity after exclusivity rights expire, Defendants implemented loyalty programs through agreements with distributors who collectively make up the majority of all pesticide sales in the United States. Each Defendant designs and administers its loyalty program with the purpose, intent, and expectation that the program will impede generic competition and thereby maintain market prices and branded market share at levels higher than would otherwise prevail in a competitive market. Each does so for its own benefit and for the benefit of its respective distributor.

39.     Under their respective loyalty programs, Defendants offer substantial exclusion payments to distributors, conditioned on their limiting their sales of generic crop protection products containing specified post-patent AIs.

40. Defendants are among the top 20 global agrochemical companies. Indeed, in Fiscal Year 2021, Syngenta was reported to be number one (with $13.3 billion in sales), BASF was reported to be number three (with $7.7 billion in sales), and Corteva was reported to be number four (with $7.2 billion in sales).[2]

41. Defendants' loyalty programs sidelined generic manufacturers' products, allowing Defendants to maintain market share despite pricing their crop protection products above competitive levels. The programs allow distributors to reap profits from prolonged elevated pricing of Defendants' branded pesticides. Through this, each Defendant has substantially achieved and maintained its monopolistic goals through its loyalty program with distributors. Defendants have kept generic manufacturers from supplying meaningful competition which allowed Defendants to raise, fix, maintain, or stabilized prices for certain crop protection products above competitive levels.

42. Syngenta operates its loyalty program—called the "Key AI" program—with both distributors and retailers. The Key AI program is implemented through written marketing agreements with distributors. BASF operates a similar program through what it now calls its "Share of Wallet" ("SOW") program with its distributors. Corteva likewise operates a similar program with its distributors through what it now calls its "Retailer Advantage" program.

43. Through their respective loyalty programs, Defendants incentivize distributors to refuse to sell generic manufacturers' pesticides. This enables Defendants to increase market prices and maintain or increase their shares of pesticides relied on by farmers.

44. Defendants' loyalty programs are specifically designed to maintain supra-competitive prices and profits, which the Defendants then share with their distributors, at the expense

---

[2] Shane Thomas, *Upstream AG Insights - October 16, 2022*, UPSTREAM AG INSIGHTS (Oct. 16, 2022), http://upstreamaginsights.substack.com/p/upstream-ag-insights-october-16th?utm_source=profile&utm_medium=reader2.

of farmers, in return for the distributors restricting generic manufacturers' access to the traditional distribution channel. The agreements require participating distributors to meet very high loyalty thresholds for each active ingredient and to deter them from marketing significant volumes of competing, lower-priced generic products, in exchange for a share of the profits resulting from the scheme.

45.     Defendants' agreements with distributors provide exclusion payments in exchange for selling and, by prerequisite, stocking certain volumes of specific AIs. Whether labeled as "loyalty thresholds," "loyalty requirements," or described in terms of "qualifying EDI products volumes" (where "EDI" refers to "Environmental Data Initiative"), these programs incentivize distributors to drastically limit both their supply and sale of generic products for specific AIs.

46.     Because the loyalty program incentive payments are so important to the distributors' profits, it is virtually guaranteed that distributors will sell minimal amounts of generic products, as they must reach the obligatory thresholds under the loyalty programs to garner such profits. Some loyalty program agreements go so far as to forbid distributors from purchasing any products from generic manufacturers. Some distributors have deferred generic product purchases until the end of the season to make sure they meet the required threshold under the loyalty programs, leaving farmers without a reasonable choice of product during the time farmers most need it. Defendants and distributors have firmly upheld the terms of their loyalty programs. Indeed, if a distributor fails to so restrict its sales of generic product pursuant to the loyalty program agreement, it will be monetarily penalized.

47.     The volume of sales by participating distributors assures Defendants that no significant competing distributor will partner closely with lower-priced generic manufacturers.

**D.     Loyalty Agreements: Their Operation and Effect**

48.     Over several years, Plaintiff purchased from one or more of the distributors

identified above, who were incentivized to stock and sell such branded products pursuant to the programs described below. Although Defendants have used varying terminology, threshold requirements, and EDI volumes as their programs developed, the unlawful intent and nature of these agreements has remained consistent.

### 1) Syngenta's "Loyalty Program"

49.     As early as 2004, Syngenta acted with distributors to incentivize their stocking and sale of its certain brand products to U.S. farmers. The 2004 agreement covered AI products that are at issue here, as seen below:



50.     To further maintain its monopoly, Syngenta unlawfully targeted generics by incentivizing Retailers to block generic infiltration into Relevant Markets, as depicted in this 2004 Loyalty Program Agreement.

**Key Active Ingredient Support**

*Rewards Retailers for their loyalty to Syngenta brands where a generic alternative exists.*

| ACTIVE INGREDIENTS | BRANDS | SYNGENTA THRESHOLD SHARE | INCENTIVE |
|---|---|---|---|
| Abamectin | Agri-mek®, Zephyr®, and Clinch® | 98% | 5% |
| S-metolachlor | Boundary®, Bicep II MAGNUM® brands, Dual MAGNUM® brands, Expert™, LUMAX™ and Sequence™ | | |
| Paraquat | Gramoxone Max™ | | |
| Lambda Cyhalothrin | Warrior® and Karate® | | |
| Flumetralin | Prime+® | 95% | |
| Chlorothalonil | Bravo® brands and Tilt®/Bravo® | | |
| Propiconazole | Orbit™ and Tilt® | 90% | |
| Mefenoxam | Ridomil Gold® brands | | |
| Prometryn | Caparol® | 85% | |

51.       This 2004 Loyalty Program protected multiple AIs, including paraquat—which each Plaintiff purchased—by requiring retailers to meet a 98% threshold share in order to collect a 5% incentive payment. The threshold requirement meant that the participating retailer could not carry or sell greater than 2% of competing generic products containing these AIs, essentially blocking any meaningful competing generic products from entering this point in the distribution chain.

52.       Through additional incentive programs, distributors could achieve even greater profits by meeting each "support" programs' mandatory stocking, selling, or blocking incentive requirements. The profits from the maximum incentive programs shown below would have translated into the millions:

**Summary of Maximum Potential Incentives under 2004 Syngenta Southern Field Crops Retailer Offer.**

| Bulk Brands | Maximum Incentive Possible |
|---|---|
| Bicep II MAGNUM® brands, Dual MAGNUM® brands and LUMAX™ | 19% |
| AAtrex®, Bravo® brands, Boundary®, Caparol®, Expert™, Gramoxone Max™, Sequence™ and Touchdown® brands | 16% |
| Princep® | 11% |
| Touchdown CF™ | 9% |
| Package Brands | Maximum Incentive Possible |
| Karate®, Tilt® and Warrior® | 14% |
| AAtrex®, Abound®, Agri-mek®, Amistar™, Bicep II MAGNUM® brands, Boundary®, Bravo® brands, Carnix™, Caparol®, Callisto™, Centric®, Clinch®, Curacron®, Cruiser® on commercially treated cotton seed, Denim™, Dual MAGNUM® brands, Envoke™, Expert™, Flexstar®, Force® 3G, Fusilade®, Fusion®, Gramoxone Max™, LUMAX, Omega®, Orbit®, Platinum®, Platinum®/Ridomil Gold®, Prime+™, Proclaim®, Quadris®, Quadris®/Bravo®, Quilt™, Reflex®, Ridomil Gold® brands, Ridomil®/Bravo®, Sequence™, Suprend™, Tilt/Bravo®, Touchdown® brands except CF, Uniform™ (Quadris®/Ridomil Gold®), Zephyr® | 9% |
| All other participating package brands | 4% |

53. Importantly, although billed as a "retailer" program, the program is reflective of the industry's blurred distinction between retailers and distributors. Syngenta defined "Retailers" as "a retail business which purchases Syngenta products from Syngenta or an authorized Syngenta Distributor who has been appointed by Syngenta to sell and service eligible Syngenta products within the retailer's geographic area and resells such products to growers."

54. The program uses the term "distributors," as shown below, when delineating the qualifications for participating in the same programs:

- Qualification and performance for this program are determined based on net EDI sales transactions as reported by an authorized Syngenta distributor and then sold to growers. Net EDI sales are defined as purchases in weight or volume minus any returns from a contracted Syngenta Distributor. Purchases from ineligible entities or unauthorized distributors will be disqualified and not included in qualification or payment. Any volumes determined by Syngenta to be 'brokered' will be disqualified.
- Sales from Retailer-to-Retailer do not qualify for qualification levels or program incentives.
- Distributors and Distributor-owned Retailers cannot claim sales to or from independent Retailers for qualification and or incentive payment under this program. Any sales made by a Distributor must be reported to Syngenta with accurate Retailer or 'end user' designation. Reporting sales to Retailers as 'end users' is fraud and will result in data being declared ineligible for consideration in this program. Reporting of excessive quantities that equate to more products than an 'end user' can use on his acreage will result in data being declared ineligible for consideration in this program. Sales to 'brokers' (including Internet brokers), and others that are not considered Retailers by definition in this program will be disqualified. Syngenta reserves the right to be the final authority in determining the validity of data and the inclusion of said data in this program.

55. A similar 2016 Syngenta loyalty program agreement shows the continued scheme to protect its monopoly of "key AIs" by rewarding retailers for supporting certain Syngenta AIs when

a generic alternative exists. The image below, excerpted from the 2016 Syngenta LP, shows continuation of incentives on older AIs and inclusion of new AIs.

| ACTIVE INGREDIENTS | PRODUCTS | RETAILER SUPPORT THRESHOLD | INCENTIVE |
|---|---|---|---|
| **Section 2. Key Active Ingredient Support** Reward Retailers for their support of Syngenta products where a generic alternative exists. | | | |
| Mesotrione | Acuron, Callisto 4SC, Callisto GT, Callisto Xtra, Halex GT, Lexar EZ, Lumax EZ, Zemax | 99% | **5%** |
| Clodinafop | Discover NG | 98% | |
| Azoxystrobin | Abound, Quadris, Quadris Opti, Quadris Top, Quadris Top SB, Quadris Top SBX, Quilt, Quilt Xcel, Uniform | 94% | **10%** |
| Diquat | Reglone | 90% | **5%** |
| Flumetralin | Prime+ | | |
| Fomesafen | Flexstar, Flexstar GT, Flexstar GT 3.5, Prefix, Reflex | | |
| Mefenoxam | Quadris Ridomil Gold, Ridomil Gold brands, Ridomil Gold Bravo | | |
| S-metolachlor (S-MOC) | Bicep II Magnum brands, Bicep Lite II Magnum, BroadAxe XC, Boundary, Dual Magnum, Dual II Magnum brands, Expert, Sequence | | |
| Abamectin | Agri-Flex, Agri-Mek SC | 85% | |
| Lambda Cyhalothrin | Karate with Zeon Technology, Warrii II with Zeon Technology | | |
| Paraquat | Gramoxone SL, Gramoxone SL 2.0 | | |

56.     The products above are listed by AI, including azoxystrobin and paraquat, all of which have been purchased by Plaintiff. Retailers are required to stock and sell each Syngenta AI at a certain threshold in order to receive an incentive (*i.e.*, a rebate).

57.     Thus, by way of example, to obtain the 5% incentive applicable to mesotrione, the retailer must achieve a threshold of 99% Syngenta mesotrione sales. For azoxystrobin, the threshold is 98% and the incentive is even higher—10%. And for s-metolachlor, it is 90%. Older AIs, such as paraquat and lambda cyhalothrin, that once required a 98% threshold in 2004, still required an 85% threshold in 2016. Thus, the threshold and incentive amounts changed, but the objective did not.

58.     The purpose and effect of the 2016 loyalty program remained the same: in order to obtain the incentive, a retailer must virtually exclude from its inventory generic products containing the AI. Such incentive payments have a substantial impact on distributors' income.

59. As reflected in these documents, Syngenta polices these requirements rigorously. It starts by collecting data from the distributors, which must provide information about their total net sales to farmers of Syngenta and generic products before Syngenta will make incentive payments. Syngenta provides distributors with a handy digital calculator app to assist them in making sure they have correctly calculated the necessary support threshold. Syngenta reserves the right to verify the accuracy of the distributors' math and to independently audit the threshold figures to confirm, to Syngenta's satisfaction, that the retailers have earned Syngenta's incentive award by selling the required percentages of Syngenta AI. Syngenta has had these programs for many years.

60. As also reflected in these documents, Syngenta can modify the incentive system, at will, based on its determination of changes in the market, and has full discretion to change the AI calculator at any time to reflect what Syngenta believes are the current marketplace conditions. Syngenta's loyalty program thus deprives generic competitors of the ability to gain meaningful market share, as is intended. Such suppression of generic market penetration causes the Plaintiff and farmers to pay artificially maintained, higher prices for these products.

### 2) BASF's EDI program and SOW program

61. BASF's history of acting with distributors has included utilizing EDI volume goals to disincentivize stocking and selling of competitor generic products and later incorporating its "Share of Wallet" program to accomplish the same objective.

62. Like Syngenta, and in accordance with industry practice, BASF's 2004 loyalty program agreement encompassed actions by participating distributors. (Excerpts from the 2004 BASF LP are attached as Exhibit 3). As seen in the below excerpt from the 2004 BASF loyalty program, though BASF's program is labeled as a "Retailor Package Program," it also explicitly includes

distributors under "Eligibility."[3]



**2004 BASF Retailer Package Program**

Effective: October 1, 2003

**Objective:**
To strengthen long-term, strategic, business relationships between BASF and Retailer accounts by rewarding local demand creation efforts and stewardship of BASF package brands. BASF endeavors to assist Retailers in growing their business with grower customers through product technology, convenient packaging and product support.

**Program Period:**
October 1, 2003 through September 30, 2004

**Effective Area:**
All states in the U.S. marketing area

**Eligibility:**
❑ All Retailers meeting the minimum BASF net sales dollars required for its defined geography reported through EDI by October 8, 2004.

❑ Only purchases from BASF Authorized Distributors will be eligible.

63.     Under its 2004 program, BASF sought to exclude generic competition by incentivizing participating distributors to maintain at least 90% of specific brand BASF sales from year to year. Incentives were based on "Net EDI sales defined as Authorized Distributor transmissions of product movement transactions" from October 1, 2003, through September 30, 2004.[4]

64.     If a participant failed to obtain a 90% repeat of sales from years 2003 to 2004, BASF's offer rebate was halved, causing a loss of profits within the millions for any participating distributor. The program's associated schedules are detailed below.

---

[3] 2004 BASF Retailer Package Program.
[4] *Id.*

| Participating Incentivized BASF Package Brands | Schedule A | Schedule B |
|---|---|---|
| | If 2004 Total Qualified BASF Net EDI Sales (Bulk + Package) is **90% or Greater** Than Retailer's 2003 Total Qualified BASF Net EDI Sales | If 2004 Total Qualified BASF Net EDI Sales (Bulk + Package) is **Less Than 90%** of Retailer's 2003 Total Qualified BASF Net EDI Sales |
| Apogee®, Beyond™*, Cabrio® EG, Cadre® DG, Clarity®, Conclude Xact®,Counter® CR and 15G, Distinct®, Facet®, Frontier®, G-Max Lite™, Guardsman®, Guardsman Max™, Newpath®, Nexter®, Pentia®, Pix® Plus, Pix® Ultra, Ponnax®, Outlook®, Prowl® EC, Prowl® H₂O, Pursuit®, Pursuit® Plus, Raptor®, Regent®, Rezult®, Scepter®, Squadron®, Sovran®. | *12%* | *6%* |
| Acrobat® 50WP, Backdraft® SL, Celebrity Plus®, Extreme™, Marksman®, Paramount®, Pyramite™, Ronilan®, Steel®, Weedmaster®. | *8%* | *4%* |

\* Brands repacked by distributors or shuttles filled by BASF will be paid at the same percentage as the package payment for that brand
\*\* Excluding the states of WA, OR, ID, MT, CA, UT, NV

**2004 BASF Retailer Package Program Rules and Conditions:**
❑ Payment Incentives will be calculated at a Retailer's Operating Unit level.

❑ All Payment Incentives will be based on Net EDI Sales defined as Authorized Distributor transmissions of product movement transactions via EDI (purchases less returns) from October 1, 2003 to September 30, 2004.

65. The program's requirement that participating distributors essentially repeat their percentage of participating brand product sales from 2003-04, worked to ensure that there would be little room in the market for generic competitors selling the AIs at issue.

66. In 2022, BASF continued its efforts to thwart generic intrusion of its key AI market into the traditional distribution channel through its adapted loyalty program, which is now called "SOW."

67. The term SOW indicates the percentage of sales of BASF branded products that a retailer must achieve to earn the "Base Incentive" for the "AI Loyalty Brands." As with Syngenta, the program is policed through a requirement that the retailer submit SOW percentages to BASF to be entitled to any incentive payments.

68. This BASF 2020-21 loyalty program agreement required participants to maintain

90% to 95% thresholds on multiple brand products to receive its valuable SOW incentive. As shown below, BASF listed those AI products, all believed to be off-patent, which were subject to 90% or higher threshold requirement.

4. **AI Loyalty Requirement**:

| AI | BRANDS | SOW REQUIREMENT | ACTIVITY |
|---|---|---|---|
| BOSCALID | **Endura EG** fungicide, **Pristine EG** fungicide | 90% | BASF Authorized Retailer is required to submit SOW% through enrollment tool by October 15, 2021 |
| F500 | **Cabrio** fungicide, **Headline AMP** fungicide, **Headline EC** fungicide, **Headline SC** fungicide, **Merivon** fungicide, **Nexicor** fungicide, **Priaxor** fungicide, **Pristine EG** fungicide, **Revytek** fungicide, and **Veltyma** fungicide | 90% | |
| GLUFOSINATE-AMMONIUM* | **Liberty** herbicide, **Noventa™** herbicide, and BASF sourced private label Glufosinate-ammonium | 90% | |
| IMAZAMOX | **Beyond** herbicide, **Raptor** herbicide, and **Varisto** herbicide | 95% | |
| PENDIMETHALIN | **Prowl 3.3 EC** herbicide, **Prowl H2O** herbicide and BASF sourced private label Pendimethalin | 90% | |

\* Glufosinate-ammonium loyalty requirement is waived for: AZ, CA, FL, ID, NV, OR, UT and WA.

a. In order to earn the Base Incentive on AI Loyalty Brands (listed above) an active ingredient Share of Wallet (SOW) is required at the thresholds indicated as the SOW Requirement:

- 90% SOW on Boscalid containing brands
- 90% SOW on F500 containing brands
- 90% SOW on Glufosinate-ammonium containing brands
- 95% SOW on Imazamox containing brands
- 90% SOW on Pendimethalin containing brands

### 3) Corteva's, and Its Predecessor DuPont's, EDI Volumes Programs

69.     Corteva, and its predecessor Dupont, used EDI volumes as the basis of its various programs to incentivize participating distributors to limit generic competition to its key AIs.

70.     Prior to the merger of Dow and DuPont, the latter had in place the "DuPont Agricultural Retailer Sales & Service Incentive Offers" program that offered incentive payments to retailers profiting on DuPont crop protection products.

71.     The program was implemented by rebates calculated with reference to "base incentives" and "additional incentives" that allowed distributors to engage in "stewardship" for DuPont branded products, which meant selling less generic competitive products. Likewise, prior to

the merger, Dow had a similar program that incentivized "Stocking" and "Stewardship" for its branded products.

72.　　　Dow's Stocking incentive required retailers to stock and sell a certain threshold percentage of its branded products. More specifically, the Stocking program required participants to stock and sell an amount of certain AI products based on the previous year's EDL, ensuring that only a minimum percentage of generic, competing products could enter that participant's chain of distribution. As seen in the image below, the stocking threshold for certain AIs reached up to 75% of the previous year's EDI volume.



Stocking

Once the minimum requirement is met by the stocking date and sold by the end of the Market Year, payment is made on all net purchases during the program year.

| Product | Stocking Pay Rate | Min. Volume Customer Must Stock & Sell in 2005-2006 | Date |
|---|---|---|---|
| Sonalan° 10G herbicide | 4.5% | 8,000 lbs. | 11/15/05 |
| Sonalan HFP Bulk | 4.0% | 1,000 gallons | 11/15/05 |
| Dow AgroSciences Branded Acetochlor Bulk | 4.0% | 1,000 gallons | 12/5/05 |
| Dow AgroSciences Branded Acetochlor Custom Repack | 4.0% | Minimum repack order | 12/5/05 |
| Lorsban° 15G insecticide | 10.0% | 75% of 2004-2005 EDI | 12/5/05 |
| Treflan° TR-10° herbicide | 4.5% | 70% of 2004-2005 EDI | 12/5/05 |
| Glyphomax° XRT herbicide & Durango° herbicide Bulk | 4.0% | 1,000 gallons | 2/15/06 |
| FirstRate° herbicide | 4.0% | 70% of 2004-2005 EDI | 3/15/06 |
| Glyphomax XRT & Durango Custom Repack | 4.0% | Minimum repack order | 3/15/06 |
| Glyphomax XRT & Durango package | 4.0% | 70% of 2004-2005 EDI | 3/15/06 |
| Hornet° WDG herbicide | 3.0% | 70% of 2004-2005 EDI | 3/15/06 |
| Pendimax° 3.3EC herbicide Bulk | 6.0% | 1,000 gallons | 3/15/06 |
| Pendimax 3.3EC Custom Repack | 6.0% | Minimum repack order | 3/15/06 |
| Pendimax Package | 6.0% | 70% of 2004-2005 EDI | 3/15/06 |
| Python° WDG herbicide 4x2.5 lbs. | 4.0% | 70% of 2004-2005 EDI | 3/15/06 |
| Sonalan HFP Package | 4.0% | 70% of 2004-2005 EDI | 3/15/06 |

73.　　　As seen below, the same 2005-06 program also offered a Stewardship incentive program for certain products that met an 80% EDI threshold:

4. Dow AgroSciences may make program progress payments during the 2005-2006 Market Year:
  (a) Progress payments are based on 80% of the stewardship earnings of participating products calculated from EDI-reported data available to Dow AgroSciences.
  (b) Final payment issued by December 31, 2006.
  (c) Following the program end date and final payment for the 2005-2006 program, any change in an EDI product value resulting in a negative program earning will be deducted from future Dow AgroSciences Retail Program earnings.

74.     In a 2015 DuPont loyalty program agreement, participants had to exceed their prior year's sales of specific AIs and products in exchange for an additional profitable bonus offer. The 105% threshold seen below meant that even fewer generic competitor products than the small percentage allowed under the program's terms the previous year would be allowed to compete.

**Sales and Service Pays**
The Sales and Service Pays incentive is a reward for achieving total portfolio growth vs the prior year.

**Criteria**
- Qualify for the Retail Advantage - Sales and Service Incentive
- Earn 1% on total portfolio sales with growth of 105% over prior year.
- Earn another 1% on the total portfolio if sales growth of the following products collectively total 105% over prior year.
  - Afforia™, Aproach® Prima, Coragen®, Envive®, Fontelis®, LeadOff®, Prevathon®, Realm® Q and Vydate® C-LV.

75.     Programs similar to the 2005-06 DuPont program are carried on by Corteva. Corteva's loyalty program agreement is reflected in the below image, excerpted from its 2020-21 Retailer Offers brochure.

**Retail Advantage Program**

The Retail Advantage Program has been designed to provide retail channel partners with competitive rewards for supporting Corteva products.

**Program Qualification**

The Corteva Agriscience™ Retail Advantage Program payment is based on product volume reported by approved distributors via EDI to Corteva. Only products intended for resale to growers are eligible for payment under the terms of this program. Retail customers must have purchased a minimum of $50,000 of participating and qualifying products between Oct. 1, 2020 and Sep. 30, 2021 to be eligible for program earnings.

**Program Payment**

Retailers will have an opportunity to earn a reward payment on participating products provided the following criteria are met:

- Participating in training workshops as needed
- Work with the Corteva Territory Manager to develop new market or product opportunities
- Promptly reporting product or performance concerns
- Work with the Corteva Territory Manager to resolve any product or performance issues that may arise
- Follow the product label and providing sound agronomic recommendations
- Comply with all local, state and federal regulations in the storage and distribution of Corteva products
- Submit valid Grower data for the Corteva crop protection portfolio

**Qualifying Products for EDI Product Values**

Additional Corteva Agriscience™ Crop Protection and Range & Pasture EDI product values count toward meeting the $50,000 purchase requirement, but do not participate in any retail payments. For more information, see terms and conditions section in the back of this book.

**Where to submit data**

www.yourdatadimensions.com
Customer Support: 1-800-901-0012

Data Dimensions User Guide
www.yourdatadimensions.com/
UserGuide/UserGuide.pdf

**How to submit Grower Purchase data**

- Upload an existing Excel file containing required information and utilize the Data Dimensions mapping tool
- Key in purchase information fields that are prompted on website
- Utilize vendor support SSI/AgVance and Agrimine. Contact information found in user guide
- EDI/XML data currently fed into Data Dimensions for reporting purposes

**Key dates**

- Program dates:
  Oct. 1, 2020 – Sep. 30, 2021
- Grower point of sale data report deadline: Oct. 15, 2021

Not applicable to products sold outside the United States

76. To obtain the rebates promised under this program, the Retailer must be a significant force in the market, with a minimum of $50,000 in Corteva sales during the previous year. The distributor must also work closely with a Corteva Territory Manager, which would necessarily impede it from making any purchases of generic crop protection products manufactured by generics that compete with Corteva branded products. And the distributor must submit valid grower data to Corteva consisting of an Excel spreadsheet reflecting purchases from it by growers.

**E.    Exclusive Loyalty Programs are Detrimental to U.S. Farmers.**

77. In September 2022, the FTC, joined by multiple state Attorneys General ("AGs")

filed a lawsuit against Defendants over these practices.[5] The lawsuit and the separate joinder statements of state AGs unequivocally assert that, after an extensive investigation, Defendants are engaged in a scheme to minimize generic penetration of the markets for AIs used in crop protection by bribing distributors through incentives that ensure they will sell little, if any, generic alternatives.

78.     The consequences for farmers are significant because generic competition translates into lower retail prices for affected crop protection products; thus, Plaintiff's and farmers' incomes are directly and negatively affected.

79.     In announcing his state's joinder in this action, the Minnesota AG stated:

> To encourage innovation, companies such as Syngenta and Corteva can initially develop, patent, and register active ingredients in their products and exploit their commercial potential for several years. After those protections expire, generic manufacturers may enter the market with products with the same active ingredients and relying on the same toxicology and environmental impact studies. *This competition ordinary leads to dramatic price reductions, benefiting farmers and consumers.*[6]

80.     An op-ed piece by FTC Chair Lina Khan, published in the *Des Moines Register* explained the issue in greater detail:

> The scheme starts with patents. Companies like Syngenta and Corteva are in the business of inventing new active ingredients for pesticides. Each time they do, they get to patent that invention. A patent entitles an inventor to a 20-year period where only they are allowed to sell the invention. But there's a compromise: Once the patent expires, anyone is free to bring a generic version into the market. That's why

---

[5] *Federal Trade Commission, et al. v. Syngenta Crop Protection AG*, M.D.N.C. 1:22-cv-00828 (9/29/2022) at ¶ 90, available at,
https://www.docketalarm.com/cases/North_Carolina_Middle_District_Court/1--22-cv-00828/FEDERAL_TRADE_COMMISSION_et_al_v._SYNGENTA_CROP_PROTECTION_AG_et_al/1/.
[6] Donnelle Eller, *Iowa joins 9 states in suing ag pesticide makers, alleging anticompetitive practices*, DES MOINES REGISTER (Sept. 30, 2022),
http://www.desmoinesregister.com/story/money/agriculture/2022/09/30/iowa-joins-states-suing-corteva-syngenta-over-loyalty-programs-lawsuit/69528808007/.

when you have a headache, for example, you can choose between Tylenol and generic acetaminophen. When someone holds a patent they can generally charge high prices, given that nobody else can sell that product. But once the patent expires and generics come in, the original patent holder should have to compete with them, including on price.

Syngenta and Corteva weren't satisfied with this compromise. They wanted to keep raking in big profits even after the patents expired. To do that, our lawsuit alleges, each company plotted to cut farmers off from cheaper generic alternatives. In general, manufacturers don't sell pesticides directly to farmers. They sell to distributors. Syngenta and Corteva realized that these distributors were a potential choke point. So they each launched "loyalty programs" in which distributors who bought their products would receive large payments, styled as a rebate. The catch: If those middlemen distribute too many generic pesticides, they don't get the money. In other words, distributors get paid to exclude generics.

This works out the way you'd expect. Distributors don't want to miss the payments, so they go along with the program. After all, it doesn't hurt them to spend more on brand-name pesticides, because they get to pass those costs on to retailers and, ultimately, to farmers. With distributors understocking generics, farmers end up having little choice but to buy Syngenta and Corteva. And here is the payoff to the whole scheme: Because farmers are locked into buying their stuff, Syngenta and Corteva can keep charging inflated prices, as if their products were still under patent. The pesticide giants can make more profits by blocking rival products from the market than by competing with them.[7]

Importantly, the FTC complaint refers to similar arrangements.

81.     The difference in price between the branded product subject to a loyalty program and its generic substitute can be substantial; in some instances, the generic product's retail price can

---

[7] Lina Khan, *Opinion: AG companies' loyalty programs unfairly extract profits from consumers*, DES MOINES REGISTER (Oct. 6, 2022), http://www.desmoinesregister.com/story/opinion/columnists/2022/10/06/syngenta-cortevafarmers-lawsuit-unfairly-extract-profits-from-consumers/69542239007.

be 8% of the branded product's retail price.

**F. Defendants' Anticompetitive Activities are Ongoing and Unceasing.**

82.     Defendants had the opportunity to discuss and coordinate their respective loyalty programs through CropLife America ("CLA"), the national trade association that represents the manufacturers, formulators, and distributors of crop protection products. Only manufacturers and distributors of crop protection products are eligible for full membership in CLA. Corteva, BASF, and Syngenta are members of this trade association; a representative of Corteva formerly chaired its Board of Directors and its current chair, elected in 2022, is Paul Rea of BASF Agricultural Products Group. Coordination with respect to loyalty programs was also available through the Agricultural Retailers Association ("ARA"), which "advocates, influences, educates and provides services to support its members in their quest to maintain a profitable business environment, adapt to a changing world and preserve their freedom to operate."[8] Current members of the Board of ARA include representatives of Nutrien, Corteva, and Syngenta. The CRA cooperates extensively with the ARA.

83.     Syswato Das, a spokesperson for Syngenta, has said that the loyalty programs are part of a longstanding "*voluntary and industry-standard program*" (emphases added) and asserted that "[w]e are disappointed that the FTC has failed to appreciate the beneficial effects that these rebate programs provide to our channel partners and to growers." Kris Allen of Corteva expressed similar views.[9] And Vern Hawkins, Syngenta's President of Crop Protection, has taken the extreme step of accusing Lina Khan of the FTC of lying in her aforementioned op-ed article.[10]

**G. Relevant AIs**

**Syngenta AIs**

---

[8] ARA, https://www.aradc.org/about/about-ara (last accessed Feb. 13, 2023).

[9] Margey Eckelcamp, *8 Thing to Know About the FTC Suing Syngenta and Corteva*, (Oct. 10, 2022), http://www.thepacker.com/news/produce-crops/8-things-know-about-ftc-suing-syngenta-and-corteva.

[10] Meghan Grabner, *Syngenta Pushes Back Against FTC Complaint*, (Nov. 2, 2022), http://brownfieldagnews.com/news/syngenta-pushes-back-against-ftc-complaint/.

84.	Syngenta's loyalty program applies to several AIs, a number of which Plaintiff has purchased over the course of several years. The Syngenta AIs that are the primary focus of this Complaint are metolachlor (and s-Metolachlor), mesotrione, azoxystrobin, paraquat, and lambda cyhalothrin. These are referred to collectively as the "Syngenta Relevant AI(s)."

85.	***Metolachlor (s-Metolachlor).*** Metolachlor (which term is used herein to refer to both the original metolachlor compound and the subsequent s-metolachlor variant, each as described below) is an herbicide used on a wide variety of crops, including corn, soybeans, grain sorghum, cotton, peanuts, potatoes, vegetables, sunflowers, and sugar beets. Sales of crop protection products containing metolachlor in the United States exceeded $400 million in 2020.

86.	Syngenta's relevant patent protection for its original metolachlor expired in or about 1996. A Syngenta predecessor company developed, patented, and registered a variant of the original metolachlor, known as s-metolachlor. Syngenta's relevant patent protection for s- metolachlor and subsequent exclusive-use period for s-metolachlor expired in 2003. As noted in the 2016 Syngenta document discussed above, s-metolachlor sales by a Retailer that reached the 90% threshold were subject to a 5% incentive rebate.

87.	***Mesotrione.*** Mesotrione is a widely used corn herbicide. Sales of crop protection products containing mesotrione in the United States exceeded $200 million in 2020. Mesotrione was initially developed, patented, and registered with the EPA by Syngenta (including Syngenta affiliates). Syngenta's relevant patent protection for mesotrione has expired.

88.	Under its loyalty program, Syngenta made exclusion payments to its distributors who refrained from marketing significant volumes of competing, lower-priced generic mesotrione products. As noted in the 2016 Syngenta document discussed above, Retailers who recorded 99% of branded mesotrione products could obtain a 5% loyalty rebate.

89.     Generic manufacturers have made few inroads with distributors.[20] At least two generic manufacturers delayed or terminated their planned entry into the mesotrione market due to loyalty-program concerns.

90.     *Azoxystrobin*. Azoxystrobin is a broad-spectrum fungicide that protects a wide variety of crops from fungal diseases. It has annual global sales of over $1 billion. Sales of crop-protection products containing azoxystrobin in the United States exceeded $100 million in 2020. Azoxystrobin was initially developed, patented, and registered with the EPA by a Syngenta predecessor company. Syngenta's exclusive-use period under FIFRA has expired. As noted in the 2016 Syngenta document discussed above, azoxystrobin was subject to a 98% loyalty threshold requirement for which a Retailer could obtain a 10% rebate.

91.     *Fomesafen.* Fomesafen is a widely used selective-applied and foliar herbicide for control of broadleaf weeds in soybeans. In 2018, approximately six million pounds of fomesafen were applied. Fomesafen was initially developed, patented, and registered with the EPA by Syngenta (including Syngenta affiliates). As noted in the discussion of the 2016 Syngenta document, fomesafen was subject to a 90% retailer support threshold for which Retailers received a 5% rebate.

92.     *Paraquat*. Paraquat is one of the most-widely used herbicides. It had annual global sales of over $90 million in 2021. Paraquat was initially developed, patented, and registered with the EPA by a Syngenta predecessor company. Syngenta's exclusive-use period under FIFRA has expired. As noted in the 2004 Syngenta document discussed above, paraquat was subject to a 98% loyalty threshold requirement for which a Retailer could obtain a 5% rebate.

93.     *Lambda Cyhalothrin*. Lambda cyhalothrin is an agricultural pesticide. Sales of Lambda Cyhalothrin in 2020 have been estimated at $1.25 billion worldwide. Lambda Cyhalothrin was initially developed by a Syngenta predecessor company and was registered by the EPA in 1988. Syngenta has sold and sells products containing lambda cyhalothrin under the names Karate® and

Warrior®, among others. Lambda cyhalothrin received patent protection until 2003. As noted in the 2004 Syngenta document discussed above, lambda cyhalothrin was subject to an 98% loyalty threshold requirement for which a distributor could obtain a 5% incentive payment from Syngenta.

94.     Under its loyalty program, Syngenta has made exclusion payments to its distributors who refrained from marketing significant volumes of competing, lower-priced generic Syngenta Relevant AI products. As noted in the Syngenta documents discussed above, Syngenta Relevant AI sales by a distributor that reached exceptional threshold ranges, in some cases as high as 99%, were subject to significant incentive rebates worth millions to participating distributors.

95.     During the relevant time period, Syngenta's loyalty program substantially limited and foreclosed generic manufacturers from providing effective competition in the sale of Syngenta's Relevant AI products. As a result, Syngenta and its co-conspiring distributors have benefitted from supra-competitive prices of Syngenta Relevant AI products even though generic manufacturers introduced competing AI products in the United States after the expiration of Syngenta's Relevant AI(s) patent exclusivity. Generic products containing these same AIs were priced significantly below Syngenta's existing crop protection products.

96.     Under Syngenta's loyalty programs, its distributors strictly managed their generic AI(s) open space, focused on marketing Syngenta Relevant AI products, rather than the competing generic's equivalent AI products, and in some cases, stopped selling generic products despite customers' continued demand for lower-priced Syngenta Relevant AI products. The loyalty program ensures distributors sell minimal, if any, generic Syngenta Relevant AI crop protection products in exchange for loyalty rebates.

97.     Syngenta's prices remain significantly above competitive levels. Syngenta's loyalty program has resulted in higher prices for crop protection products containing each of Syngenta's Relevant AI(s) than would prevail in a competitive market.

**BASF's Relevant AIs**

98.     As noted in the BASF's 2022 "Program Summary Guide" discussed above, BASF's loyalty program extends to five products, all of which are believed to be off patent.

99.     They are: (1) *boscalid*, a broad spectrum carboxinide herbicide initially used with specialty crops and now extended to other crops such as cereals and oilseed rape; (2) *F500*, offering speedy and long-lasting effectiveness in controlling a broad range of key fungal diseases in sensitive populations in over 60 crops; (3) *glufosinate ammonium*, one of the most widely-applied broad spectrum herbicides, used in controlling weeds in a huge variety of worldwide crops; (4) *imazamox*, a selective broad spectrum herbicide used for eliminating broadleaf and grassweed, particularly in connection with soybean crops; and (5) *pendimethalin*, a preemergence and postemergence herbicide used to control grasses and broadleaf weeds. All these crop protection products are among BASF's most profitable. These five products are referred to herein as the "BASF Relevant AI(s)."

100.     During the relevant time period, BASF's loyalty program substantially limited and foreclosed generic manufacturers from providing effective competition in the sale of acetochlor products. As a result, BASF has benefitted from supra-competitive prices of acetochlor products. Generic manufacturers introduced acetochlor products in the United States after the expiration of BASF's patent exclusivity. Generic competitors' products containing the BASF Relevant AI(s) were priced lower than those products. Nevertheless, generic manufacturers have made few inroads with distributors.

101.     Under the loyalty program, distributors strictly managed their generic acetochlor open space, focused on marketing the BASF Relevant AI products rather than generic products, and in some cases, stopped listing generic products despite customers' continued demand for lower-priced counterparts. The loyalty program ensures distributors sell minimal amounts of, if any, generic acetochlor crop protection products.

102.     BASF's loyalty program has deterred generic manufacturers from introducing counterparts to products containing the BASF Relevant AIs in the United States, at all, or from offering innovative new products.

103.     BASF's prices remain significantly above competitive levels. BASF's loyalty program agreements have resulted in higher prices for crop protection products containing BASF Relevant AIs than would prevail in a competitive market.

**Corteva's Relevant AIs**

104.     Corteva's loyalty program applies to a number of AIs. Those Corteva AIs that are the focus of this Complaint are oxamyl, rimsulfuron, and acetochlor (collectively referred to as the "Corteva Relevant AI(s)").

105.     ***Oxamyl***. Oxamyl is an insecticide and nematicide used primarily on cotton and potatoes, in addition to onions, apples, citrus fruits, pears, carrots, peppers, tomatoes, and tobacco. Oxamyl was initially developed, patented, and registered with the EPA by a Corteva predecessor company (DuPont). Corteva's relevant patent protection and the exclusive-use period under FIFRA have expired.

106.     ***Rimsulfuron.*** Rimsulfuron is an herbicide used on crops such as fruit, tree nuts, potatoes, corn, soybeans, peanuts, and tomatoes. Rimsulfuron was originally developed, patented, and registered with the EPA by a Corteva predecessor company (DuPont). Corteva's relevant patent protection for rimsulfuron and the exclusive-use period under FIFRA expired no later than 2007.

107.     ***Acetochlor***. Acetochlor is an herbicide that is used predominantly on corn, but also is used on cotton, soybeans, sunflowers, peanuts, potatoes, and sugarcane. Sales of crop protection products containing acetochlor in the United States exceeded $400 million in 2020.

108.     The EPA granted registration for acetochlor in 1994 to the Acetochlor Registration Partnership ("ARP"), a joint venture of basic manufacturers. The ARP continues to hold the United

States registration for acetochlor; its current partners are Corteva and Bayer. Bayer manufactures acetochlor for both parties. Relevant patent protection for acetochlor has expired.

109.     Under its loyalty program, Corteva has made exclusion payments to distributors for refraining from marketing significant volumes of competing, lower-priced generic Corteva Relevant AI products. As noted in the Corteva documents discussed above, Corteva Relevant AI(s) sales by a distributor that reached exceptional threshold ranges, in some cases as high as 105%, were subject to significant incentive rebates worth millions to participating distributors.

110.     During the relevant time period, Corteva's loyalty program substantially limited and foreclosed generic manufacturers from providing effective competition in the sale of Corteva's Relevant AI products. As a result, Corteva has benefitted from supra-competitive prices of Corteva's Relevant AI products even though generic manufacturers introduced competing AI products in the United States after the expiration of Corteva's Relevant AI(s) patent exclusivity. Generic products of these same AIs were priced significantly below Corteva's existing crop protection products.

111.     Under Corteva's loyalty programs, participating distributors strictly managed their generic AI(s) open space, focused marketing on Corteva Relevant AI products rather than generic competitors to those same AI products, and in some cases, stopped selling generic products despite customers' continued demand for lower-priced Corteva Relevant AI products. The loyalty program ensures distributors sell minimal, if any, generic Corteva Relevant AI crop protection products in exchange for loyalty rebates predicated on abstaining from selling the same AI crop protection products made by generic producers.

112.     Corteva's prices remain significantly above competitive levels. Corteva's and distributors' loyalty programs have resulted in higher prices for crop protection products containing each of Corteva's Relevant AIs that would prevail in a competitive market.

## H.     Defendants' Monopoly Power

113.    The relevant geographic market is the United States. United States farmers may not lawfully use crop protection products manufactured and labeled for use outside the United States.

114.    Separate relevant product markets exist for Syngenta's Relevant AIs (azoxystrobin, mesotrione, metolachlor, fomesafen, paraquat, and lambda cyhalothrin) ("the Syngenta AIs Market"), BASF's Relevant AIs (boscalid, glufosinate, pendimethalin, F500, and imazamox) (the "BASF AIs Market"), and for Corteva's Relevant AIs (rimsulfuron, oxamyl and acetochlor) (the "Corteva AIs Market") (collectively the Syngenta AIs Market, BASF AIs Market and the Corteva AIs Market are referred to as the "Relevant AI Market(s)").

115.    Each Defendant's Relevant AI Market consists of: (1) the technical grade or manufacturing use of each of the Defendant's Relevant AIs to be formulated into an EPA-registered finished crop protection product for sale in the United States, and (2) each Defendant's Relevant AIs as a component of an EPA-registered finished crop protection product for sale in the United States.

116.    As to each Relevant AI, allegations herein relating to the Relevant AI Market(s) apply to both sets of product markets described above.

117.    At all relevant times, Syngenta had monopoly power in the markets for azoxystrobin, mesotrione, metolachlor, fomesafen, paraquat, and lambda cyhalothrin, as well as markets for crop protection products containing those specific Relevant AIs, because Syngenta had the power to price Relevant AIs and crop protection products containing those Relevant AIs at supra-competitive levels without losing substantial sales to other products prescribed and/or used for the same purposes as azoxystrobin, mesotrione, metolachlor, fomesafen, paraquat, and lambda cyhalothrin and crop protection products containing those Relevant AIs.

118.    At all relevant times, BASF had monopoly power for Boscalid, F500, Glufosinate ammonium, Imazamox, and Pendimethalin, as well as for crop protection products containing those

specific Relevant AIs, because BASF had the power to price Relevant AIs and crop protection products containing those Relevant AIs at supra-competitive levels without losing substantial sales to other products prescribed and/or used for the same purposes as the BASF Relevant AIs and crop protection products containing those Relevant AIs.

119.     At all relevant times, Corteva had monopoly power for rimsulfuron, oxamyl, acetochlor, and crop protection products containing those specific Relevant AIs, because Corteva had the power to price Relevant AI and crop protection products containing those Relevant AI at supra-competitive levels without losing substantial sales to other products prescribed and/or used for the same purposes as rimsulfuron, oxamyl, acetochlor, and crop protection products containing those Relevant AIs.

120.     During the relevant period, the Defendants have dominated their respective Relevant AI markets with sales of their own branded Relevant AIs and crop protection products containing those Relevant AIs and by excluding generic competition through operation of each loyalty program.

121.     To the extent that Plaintiff and Class Members may be required to prove market power circumstantially, by first defining a relevant product market, Plaintiff alleges that the relevant product market is composed of each Defendant Manufacturer's Relevant AIs and crop protection products containing those Relevant AIs, both brand and generic, in all forms sold in the United States.

122.     For each Defendant's Relevant AI(s), other AIs are not close enough functional or economic substitutes to prevent Defendants from maintaining prices of crop protection products containing their specific Relevant AIs above competitive levels.

123.     For each Defendant Manufacturer's Relevant AI(s), absent the restraints of trade imposed by the Defendants' loyalty programs, unconstrained competition from generic crop protection product manufacturers would have had a significant and non-transitory downward effect

on prices in that specific Relevant AI(s) Market.

124.     Direct evidence of each Defendant's monopoly and market power includes each Defendant's ability to price its Relevant AIs and crop protection products containing those Relevant AIs above competitive levels, and to exclude competition from generic manufacturers through operation of its loyalty program.

125.     Defendants have maintained and exercised the power to exclude and restrict competition to their respective Relevant AIs and crop protection products containing those Relevant AIs, which no longer had any patent protection.

126.     Each Defendant's monopoly power is also shown through circumstantial evidence, including dominant or substantial market shares in its Relevant Market with substantial barriers to entry.

127.     Potential generic manufacturers face significant capital, technical, regulatory, and legal barriers. The Defendants' use of loyalty programs also imposed a substantial barrier to entry by, among other things, limiting generic manufacturers' access to the traditional distribution channel.

128.     Syngenta maintained dominant shares of the United States Relevant Market for its Relevant AIs azoxystrobin, mesotrione, metolachlor, fomesafen, paraquat, and lambda cyhalothrin from at least 2017 through the present.

129.     BASF maintained dominant shares of the United States Relevant Market for its Relevant AIs boscalid, F500, glufosinate ammonium, imazamox, and pendimethalin from at least 2004 through the present.

130.     Corteva maintained dominant shares of the United States Relevant Market for its Relevant AIs rimsulfuron, acetochlor, oxamyl. Each year, from at least 2017 through the present, Corteva maintained a substantial share of sales in each of these markets.

I.     **Harm to Competition and Consumers**

131.     Each Defendant's loyalty programs and other anticompetitive conduct in conjunction with the loyalty programs has harmed competition by substantially foreclosing generic competition in the Relevant Markets, thereby lessening competition; raising prices; reducing innovation; lessening choice; causing generic competitors to exit or abandon plans to enter the Relevant Markets; and/or tending to create or maintain monopolies in the Relevant Markets. Defendants' loyalty programs have also harmed consumers—i.e., farmers—by causing higher prices, reduced innovation, and reduced choice for farmers in the Relevant Markets.

132.     Each Defendant's anticompetitive conduct is not reasonably necessary to achieve any cognizable procompetitive benefits. The anticompetitive harm from their conduct outweighs any procompetitive benefits, and each Defendant could reasonably achieve any procompetitive goals through less restrictive alternatives.

133.     Each Defendant's unlawful conduct is ongoing. Upon information and belief, each Defendant continues to operate its loyalty program, including by enforcing loyalty thresholds and making payments to distributors for meeting these thresholds, thereby excluding generic competition. Absent injunctive relief ordered by this Court, each Defendant is likely to continue to harm competition and the public interest.

**J.     Foreclosure of Competition**

134.     Defendants have harmed competition by foreclosing actual or potential competitors from access to distribution services, or by foreclosing actual or potential competitors from access to efficient distribution channels.

135.     The most efficient channel of distribution for each Relevant Market is through those distributors used by Defendants and controlled through the incentives of the loyalty programs. Each Defendant's loyalty program has almost entirely foreclosed generic manufacturers from access to the

traditional distribution channel. With respect to each Relevant Market, this exclusion of generic competitors from the traditional channel has harmed the effectiveness of generic competitors by severely limiting their ability to achieve efficient, cost-effective distribution, and in some circumstances *any* distribution.

136.     By excluding generic competitors from the traditional distribution channel, each Defendant's loyalty program has foreclosed a substantial share of each applicable Relevant Market to generic competition. This is because a high percentage of all pesticide sales are made through the traditional channel (over 90%) and a high proportion of the traditional channel participants in Defendants' loyalty programs. Thus, each Defendant's loyalty program has effectively foreclosed generic competitors from competing for a large portion of each applicable Relevant Market.

137.     The market foreclosure created by Defendants' loyalty programs has been of substantial duration. Generic manufacturers of pesticides containing the applicable Relevant AIs have been substantially foreclosed from the Relevant Markets for five years or more, including since at least 2017.

138.     Defendants' loyalty programs have further foreclosed competition by offering and providing payments to distributors even when distributors do not agree or otherwise commit, in advance, to meet the relevant targets that the Defendants include in their loyalty programs. The prospect of receiving a payment from Defendants—as well as profits from the higher prices caused by the market-wide exclusion of generics—has effectively induced distributors to limit or forgo purchases from lower-priced competitors that offer or would offer generic pesticides containing the Relevant AIs.

139.     Distributors adhere to Defendants' loyalty-program thresholds in significant part due to the prospect of receiving substantial payments under the programs. In addition, structural features of each Defendant's loyalty program promote adherence, and are strictly enforced.

140.     Distributors' incentive to comply with loyalty-program thresholds is further

enhanced by the fact that substantially all major distributors participate in the programs. Distributors profit more when prices to retailers and farmers are higher, therefore the distributors' collective participation in the loyalty programs results in sustained inflated prices to farmers.

141.     Distributors are further incentivized to comply with the loyalty programs by their knowledge that all of their distributor-competitors are participating, and no one is going to break ranks and lower the prices and profits that they all enjoy under the scheme or compete for market share.

142.     Together with Defendants' strict enforcement efforts, these features of Defendants' loyalty programs incentivize distributors to meet applicable loyalty thresholds by forgoing or severely limiting purchases from generic manufacturers.

143.     Upon information and belief, Defendants also discourage distributors from passing on payments made pursuant to loyalty programs to farmers. This has the effect of maintaining artificially high prices for pesticides manufactured by Defendants in the Relevant Markets.

144.     The terms of loyalty programs are confidential and are not accessible by farmers or manufacturers of generic pesticides. The complexity, lack of transparency to farmers and generic manufacturers harmed by the conduct, and deferred payment timing of loyalty programs causes distributors to retain loyalty program payments as profit and makes them less likely to pass on loyalty program payments to farmers in the form of lower prices.

145.     As a result of Defendants' respective loyalty programs, distributors have severely limited their purchase, promotion, and sale of generic pesticides containing each Relevant AI. To meet applicable loyalty thresholds, distributors have omitted generic products from their product lists, refused customer requests for generics, declined generic companies' offers to sell pesticides, and steered retailers and farmers toward branded products.

146.     As a result of Defendants' respective loyalty programs, distributors have declined to buy more than minimal amounts of pesticides containing each applicable Relevant AI from generic

manufacturers, despite sufficient demand, availability, and quality of generic products.

147.    With respect to each Relevant AI, in the absence of the applicable loyalty program, generic manufacturers would make significantly more sales to distributors, which would enable them to realize distribution efficiencies and scale benefits. These benefits would increase price competition, innovation, and choice in Relevant Markets, which in turn would benefit American farmers.

148.    In the absence of Defendants' respective loyalty programs, sales of generic pesticides containing Relevant AIs would be significantly higher and would exceed the limits dictated by the loyalty programs. American farmers would benefit from having an increased amount of lower-price generic products available in Relevant Markets.

149.    In contrast to the Relevant AIs, when selling products containing active ingredients that are not subject to the loyalty programs, generic manufacturers are able to make all or nearly all of their sales through traditional distribution channels.

150.    In the applicable Relevant Markets, Syngenta has added an additional layer of foreclosure to that created by its distributor loyalty program through its retail loyalty program. As with the distributor program, the retail program has substantially foreclosed generic manufacturers from efficient distribution of their products, given the participation of leading retailers in the program.

151.    Each Defendant's so-called "loyalty program" has prevented, delayed, and diminished entry and expansion by generic manufacturers of pesticides containing applicable Relevant AIs, and caused generic pesticide manufacturers to exit the market for products containing Relevant AIs, even when generic manufacturers can otherwise satisfy regulatory conditions and overcome other barriers to entry.

152.    Multiple generic manufacturers have concluded that entry into the market is not economically feasible due to the artificial constraints created by Defendants' respective loyalty programs.

153.     In some cases, Defendants' loyalty programs have caused foreclosure of sales opportunities that have led a generic manufacturer already competing in a Relevant Market not to re-register its product, or to stop offering a product containing the Relevant AI.

154.     In the absence of Defendants' respective loyalty programs, generic manufacturers would compete more effectively and compete for more sales in each Relevant Market.

155.     Each Defendant's so-called "loyalty program" has reduced the ability and incentive of generic manufacturers to bring new differentiated pesticides containing applicable Relevant AIs to market, harming innovation, and restricting farmer choice.

156.     Generic manufacturers often create new active-ingredient mixtures or other new offerings that meet farmer needs. Generic manufacturers also often innovate on the non-active-ingredient components of pesticides in ways that are beneficial to farmers.

157.     Because of the barriers to entry created by Defendants' respective loyalty programs, generic manufacturers have in several instances abandoned attempts to develop innovative products containing applicable Relevant AIs. For the same reason, when determining whether to bring to market an innovative product, such as a new mixture, generic manufacturers have sought to avoid using active ingredients that are subject to any of Defendants' loyalty program.

158.     In the absence of Defendants' respective loyalty programs, there would be more innovative products from generic manufacturers in the applicable Relevant Markets, leading to more farmer choice.

159.     Each Defendant's so-called "loyalty program" has resulted in higher prices to farmers for pesticides containing Relevant AIs than would prevail in competitive markets. Each Defendant's anticompetitive conduct has thwarted the downward price pressure from generic manufacturers' entry and expansion, denying these generics access to efficient and effective distribution and resulting in artificially high prices in markets for pesticides containing Relevant AIs.

160. Generic pesticides are generally priced lower than branded equivalents, and as to each Relevant AI, farmers pay more for pesticides containing the active ingredient because the applicable loyalty program artificially limits the availability of lower-priced generic alternatives. In many cases, farmers buy the more expensive, branded product because that is what is available and/or what is promoted by the traditional distribution channel, and not because that is what they prefer. Defendants' loyalty programs thus result in unmet and unrealized demand for lower-priced equivalent generic products.

161. When generic manufacturers can access the market for an active ingredient, they put downward pressure on the prices of branded products containing that active ingredient, and they exert more pressure the more access they achieve. This downward pressure affects not only lower-end brands for which generics have exact substitutes upon entry, but all products containing the active ingredient, including higher end mixture products. Defendants' loyalty programs, however, inhibit generic manufacturers' ability to access relevant markets and thus limit downward pricing pressure from generic competition.

162. Even where generic manufacturers enter and sell at low prices to distributors, Defendants' loyalty programs result in higher prices to farmers by limiting the amount of available generic product. This, in turn, enables distributors or retailers to price generic products just under branded products and to maintain branded prices, thus preventing the full benefits of generic price competition from flowing to farmers.

163. In countries where pesticide loyalty programs do not exist, generic manufacturers have been able to compete more effectively, and farmers pay correspondingly lower prices.

164. Even where generic manufacturers, over time, have been able to enter a given Relevant Market and have provided some measure of price competition, Defendants' loyalty programs have limited the effects of this competition. Defendants' respective price responses, and responses of

prices more generally in the applicable Relevant Market, have been less significant, and slower, than they otherwise would have been, absent operation of the applicable loyalty program.

## V. CLASS ACTION ALLEGATIONS

165. Plaintiff brings this action on behalf of itself and as a class action under the provisions of Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of members of the following Plaintiff Class:

> All persons or entities who, since January 1, 2004, and continuing until the effects of the unlawful conduct cease (the "Class Period"), purchased pesticides in the United States containing the active ingredients azoxystrobin, mesotrione, metolachlor, fomesafen, paraquat, lambda cyhalothrin directly from Syngenta or any distributor or retailer participating in Syngenta's Loyalty Program; rimsulfuron, oxamyl, or acetochlor directly from Corteva or any distributor or retailer participating in Corteva's Loyalty Program; boscalid, F500, glufosinate ammonium, imazamox, or pendimethalin directly from BASF or any distributor or retailer participating in BASF's Loyalty Program.

166. Excluded from the Class are Defendants and their officers, directors, management, employees, parents, subsidiaries, affiliates, and co-conspirators (i.e., distributors or retailers participating in Defendants' loyalty programs involving the Relevant AI products); and any persons or entities that purchased pesticides solely for resale to others. Also excluded are any federal, state, or local governmental entities and their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions, any judicial officers presiding over this action and their law clerks and spouses; any persons within three degrees of relationship to those living in the judicial officers' household; and the spouses of all such persons.

167. Members of the Class are so numerous and geographically dispersed that joinder is impracticable. Further, members of the Class are readily identifiable from information and records in Defendants' possession.

168. Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and members of the Class were damaged by the same wrongful conduct of Defendants.

169.     Plaintiff will fairly and adequately protect and represent the interests of members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of members of the Class.

170.     Plaintiff is represented by counsel with experience in the prosecution and leadership of antitrust class actions and other complex litigation.

171.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members, thereby making damages with respect to members of the Class as a whole appropriate. Questions of law and fact common to members of the Class include, but are not limited to:

a.     Whether Defendants conspired to unreasonably restrain trade in violation of federal antitrust laws;

b.     Whether Defendants unlawfully monopolized or conspired to monopolize the relevant markets;

c.     Whether Defendants violated Sections 1 and/or 2 of the Sherman Act;

d.     Whether Defendants violated Section 3 of the Clayton Act;

e.     The scope and duration of the alleged conspiracy;

f.     Injury suffered by Plaintiff and members of the Class;

g.     Damages suffered by Plaintiff and members of the Class; and

h.     Whether Defendants have acted or refused to act on grounds generally applicable to members of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to members of the Class as a whole.

172.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

173.     The benefits of proceeding through the class mechanism, including providing

injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in management of this class action.

174.     Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

175.     Plaintiff has defined members of the Class based on currently available information and hereby reserves the right to amend the definition of members of the Class, including, without limitation, the Class Period.

## VI.     EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

176.     By equitable estoppel, the Defendants' concealment of their unlawful combination and conspiracy has tolled any applicable statute of limitations for Plaintiff and the Class with respect to any claims and rights of action that Plaintiff and the Class have alleged in this Complaint.

177.     Plaintiff and the Class were not placed on actual or constructive notice of the conspiracies alleged herein until, at the earliest, the FTC's and AGs' September 29, 2022 complaint made public its investigation into the Defendants' misconduct and its allegations that Defendants' loyalty program agreements with the distributors restrained competition and caused higher prices, among other harms.

178.     Throughout the Class Period, the Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiff and the Class.

179.     The Defendants maintain and enforce strict confidentiality provisions in their agreements with one another and the conditions and descriptions of their respective loyalty programs. Distributors' contracts also contain strict confidentiality provisions, prohibiting the disclosures of prices retailers pay to wholesalers for the Relevant AI products.

180.     Defendants all publicly stated that they were in compliance with federal laws that governed their conduct, including federal antitrust laws. Plaintiff and Members of the Class could and

did rely on such statements and thus were misled into believing that no anticompetitive activity was occurring.

181.     For example, Syngenta's current Code of Conduct ("CoC")[11] states at page 6 that "[a]s an industry leader, we take our responsibilities very seriously. We are transparent and responsible and comply with all applicable laws and ensure that employees are aware of those laws relevant to those roles." At page 8 of the same document, it states that "[w]e ensure that all business practices comply with the competition law wherever business is conducted. Competition laws apply to business conduct in general and to all business arrangements, irrespective of whether they are written, oral, or in any other form."

182.     Corteva's CoC[12] states at page 12 that "[w]e conduct business ethically. Every time we represent Corteva Agriscience, it is our chance to make a positive impression. We speak with pride, honesty, and transparency about our work to promote trust, confidence, and sustainable business." At page 14 of the same document, Corteva states that it does not "interfere with our competitors' business relationships", or "[u]se our market strength or market information to unfairly harm or unlawfully prevent competition."

183.     BASF's current CoC[13] at page 14 touts "our integrity as a company—that means living up to the spirit and the letters of the laws that govern our industry…." At page 26 of the same document, BASF adds

> [w]e are committed to conducting our business solely on the basis of free and fair competition, and we strictly obey all applicable laws and regulations. We believe that fair, well- regulated competition strengthens our market and benefits our customers. As a market leader

[11] Available at https://www.syngentagroup.com/sites/syngenta-group/files/governance/code-of- conduct/syn-240-sg-coc-english-aw5.pdf (last accessed Feb. 15, 2023).
[12] Available at https://www.corteva.com/content/dam/dpagco/corteva/global/corporate/files/code-of-conduct/Corteva_Code_Interactive_enEN_English.pdf (last accessed Feb. 15, 2023).
[13] Available at https://www.basf.com/global/documents/en/news-and-media/publications/reports/2020/BASF_Code_of_Conduct_2020_EN.pdf (last accessed Feb. 15, 2023).

in various fields, BASF has special obligations under antitrust law for conducting our business in a way that promises fair competition. We welcome this extra responsibility, and aim to lead by example, to achieve the best for our customers. We are aware that any violation of antitrust laws can result in heavy fines, and even imprisonment, for the company, management and individuals concerned. It is up to all of us to be alert for any situation that could potentially be seen as harmful to free and fair competition.[14]

184. These promises in Defendants' respective CoCs are belied by their respective conduct set forth in this complaint. Their ultimate customers—like the Plaintiff here—relied on their self-professed integrity and law-abiding goals and were misled as a result.

185. Accordingly, prior to the filing of the FTC Action, Plaintiff and the Members of the Class have had virtually no visibility into Defendants' loyalty programs, other than those unredacted portions of the FTC's recent complaint, let alone visibility of the conspiracy to use the loyalty programs to restrain trade and maintain supra-competitive pesticide prices.

## VII. CLAIMS FOR RELIEF

### COUNT I: UNLAWFUL CONDITIONING OF PAYMENTS
### in Violation of Section 3 of the Clayton Act (15 U.S.C. § 14)

186. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

187. Defendants provided payments in the form of rebates in the sale of at-issue crop protection products to distributors in exchange for distributors' agreements not to use or deal in the goods of generic competitors in accordance with Defendants' loyalty programs. This conduct substantially lessened competition and created monopolies in the at-issue products in the Relevant Markets, in violation of Section 3 of the Clayton Act (15 U.S.C. § 14).

---

[14] *Id*. at 26.

188.     As a result, generic competition in the Relevant AI Markets was substantially restrained and the Defendants unlawfully maintained monopolies in the at-issue products, which caused the prices of the at-issue products purchased by Plaintiff and Class Members to be higher than they would have been in the absence of the Defendants' agreements with distributors.

189.     Plaintiff and Class Members were injured and damaged because they purchased at-issue products at supra-competitive prices caused by Defendants' violations of Section 3 of the Clayton Act.

## COUNT II: UNLAWFUL MONOPOLIZATION
### Monopolization in Violation of Section 2 of the Sherman Act (15 U.S.C. § 2)

190.     Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

191.     At all times relevant to assessing its conduct, Syngenta has had monopoly power in Relevant Markets for azoxystrobin, metolachlor, mesotrione, s-metolachlor, fomesafen, paraquat, and lambda cyhalothrin. At all times relevant to assessing its conduct, Corteva has had monopoly power in Relevant Markets for rimsulfuron, acetochlor, and oxamyl. At all relevant times, BASF has had monopoly power in the Relevant Markets for boscalid, F500, glufosinate ammonium, imazamox, and pendimethalin.

192.     Each Defendant has maintained its monopoly power through a course of anticompetitive and exclusionary conduct by entering and maintaining agreements with distributors that contain competition-limiting loyalty requirements and, among other things, enforcing and threatening enforcement of these requirements or the imposition of other penalties for insufficient loyalty in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

193.     Plaintiff and members of the Class were injured by Defendants maintaining their monopolization of the Relevant Markets for the at-issue products, which allowed Defendants to price

the at-issue products at artificially high levels that bar or limit competitive entry. Plaintiff and the Class Members paid higher prices for the at-issue products than they otherwise would have absent Defendants' violations of Section 2 of the Sherman Act.

194.     Plaintiff and Class Members have no adequate remedy at law to prevent Defendants' ongoing and future anticompetitive conduct and therefore seek an injunction to prevent them from continuing with such conduct.

## COUNT III: CONSPIRACY TO MONOPOLIZE
### (15 U.S.C. § 2)

195.     Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

196.     Defendants individually conspired with distributors to unlawfully maintain Defendants' monopolies in the at-issue products through anticompetitive exclusionary agreements. The co-conspiring distributors intentionally facilitated Defendants' efforts to illegally maintain their monopoly power in the Relevant Markets for the at-issue products by participating in Defendants' loyalty programs, which were designed to and did artificially restrict generic competition, as described above.

197.     The intent and goal of Defendants and their distributors was to maintain the Defendants' monopolies in the at-issue products so that Defendants and the distributors could eliminate or limit the threat from generic competition and continue to charge supra-competitive prices for the at-issue products.

198.     Plaintiff and Class Members were injured by Defendants' agreements with distributors that unreasonably restrained trade and raised, fixed, maintained, or stabilized prices of the at-issue products at artificially high levels. Plaintiff and Class Members paid higher prices for the at-issue products than they otherwise would have absent Defendants' violation of Section 2 of the

Sherman Act.

199.     Plaintiff and Class Members have no adequate remedy at law to prevent Defendants' ongoing and future anticompetitive conduct and therefore seek an injunction to prevent them from continuing with such conduct.

## COUNT IV: UNREASONABLE RESTRAINTS OF TRADE

## in Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)

200.     Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

201.     Defendants entered into unlawful contracts, combinations or conspiracies with distributors in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

202.     These agreements had the purpose and the effect of restricting sales of generic versions of the at-issue products in order to preserve Defendants' monopolies in the at-issue products and to artificially raise, fix, maintain, or stabilize the prices of the at-issue products. Distributors agreed with Defendants to essentially boycott generic versions of the at-issue products.

203.     These practices were unreasonable restraints of trade in violation of Section 1 of the Sherman Act. Even if these violations are contended not to constitute per se offenses, they are unlawful under either a "quick look" or rule of reason analysis.

204.     Plaintiff and Class Members were injured by Defendants agreements with distributors that unreasonably restrained trade and raised, fixed, maintained, or stabilized prices of the at-issue products at artificially high levels. Plaintiff and Class Members paid higher prices for the at-issue products than they otherwise would have in the absence of Defendants' violations of Section 1 of the Sherman Act.

205.     Plaintiff and Class Members have no adequate remedy at law to prevent

Defendants' ongoing and future anticompetitive conduct and therefore seek an injunction to prevent them from continuing with such conduct.

## I.    PRAYER FOR RELIEF

Plaintiff, on behalf of itself and the proposed Class, respectfully request judgment against Defendants as follows:

A.    That the Court certify this lawsuit as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be designated as class representative, that Plaintiff's counsel of record be appointed as Class counsel, and that the Court direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.    That the Court adjudge and decree that Defendants each have violated Sections 1 and 2 of the Sherman Act;

C.    That the Court adjudge and decree that Defendants each have violated Section 3 of the Clayton Act;

D.    That Plaintiff and all others similarly situated by granted injunctive relief with respect to Defendants' ongoing anticompetitive conduct;

E.    That Plaintiff and all other similarly situated be awarded damages suffered by reason of these violations and that those damages be trebled in accordance with the law;

F.    That the Court award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees and expenses, including expert fees, as provided by law; and

G.    That the Court direct such other and further relief as the case may require and the Court may deem just and proper.

## VIII.   DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: March 7, 2023               Respectfully submitted,


/s/ *Korey Nelson*
Korey Nelson
Amanda Klevorn
Hannah Quicksell
BURNS CHAREST LLP
365 Canal St. #1140
New Orleans, LA 70130
Telephone: (504)-779-2845
knelson@burnscharest.com
aklevorn@burnscharest.com
hquicksell@burnscharest.com

Warren T. Burns *(to be admitted pro hac vice)*
Kyle Oxford
Quinn M. Burns *(to be admitted pro hac vice)*
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, Texas 75202
Telephone: (469) 904-5002
wburns@burnscharest.com
koxford@burnscharest.com
qburns@burnscharest.com

*Counsel for Plaintiff and the Proposed Class*